# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

KARINA TELLO,

        Plaintiff,

v.                                              Civ. No. 2:24-390 KG/GJF

LEA COUNTY BOARD OF COUNTY
COMMISSIONERS, COREY HELTON,
MICHAEL WALKER, FERNANDO JIMENEZ,
SEAN ROACH, SONIA ESTRADA,
DIANE JURADO-GARCIA, AILEEN VIZCARRA,
ALYSSA PORRAS, DOE DEFENDANTS 1-50,

        Defendants.

## ORDER DENYING MOTION FOR PROTECTIVE ORDER
## AND REQUEST TO SEAL COURT RECORDS

        THIS MATTER is before the Court on Defendants' Joint Motion for Protective Order and

Request to Seal Court Records (Dkt. No. 79) ("Motion"), which is fully briefed. *See* Dkt. No. 90

(Response); Dkt. No. 98 (Reply). Prior to the completion of briefing, Defendant Porras withdrew

as co-movant, indicating that she now "takes no position in the motion."[1] Dkt. No. 83. The Court

held a September 8, 2025 evidentiary hearing ("Hr'g")[2] at which it heard testimony from Jim

Hardy, Diana Jurado, and Victor Murillo and admitted exhibits, including those attached by the

parties to their briefing. Altogether, the Court admitted the following exhibits, which it has

considered for purposes of the Motion to the extent it finds them relevant and accessible:[3]

---

[1] The Court's use of "Defendants" in this Order refers to all Defendants *who are also movants*. The Court acknowledges that Defendant Porras's Notice of Withdrawal (Dkt. No. 83) means that she is no longer among the Defendant-Movants, and it does not consider her as such when it refers to "Defendants" herein.

[2] The Hr'g citation refers to an audio recording of the September 8, 2025 evidentiary hearing stored on the Court's Liberty system. Neither the audio recording nor a transcript is currently available on CM/ECF; however, any party may obtain the recording through the Court's records department and have it transcribed.

[3] To avoid confusion, the Court instructed the parties to mark and in some instances *re-mark* certain exhibits. Specifically, due to the use of duplicate exhibit numbers, the Court directed Defendants to re-mark the exhibits attached

- **Defendants' Exhibit 1**, Affidavit of Jim Hardy and attached Motion to Suppress with Exhibits (Dkt. No. 79 at 14–55)
- **Defendants' Exhibit 2**, 12-Page Excerpt of Online Exchange Ostensibly Between Plaintiff and Amy Jones (Dkt. No. 98-1 at 1–12)
- **Defendants' Exhibit 3,** Single-Page Excerpt from Eddy and Lea County Exposed Facebook Page (Dkt. No. 98-2)
- **Defendants' Exhibit 4**, "Snapshot" of the Condition of the Eddy and Lea County Exposed Facebook Page as of September 8, 2025 (Dkt. No. 97 at 1)[4]
- **Plaintiff's Exhibit 1**, Defendant's Motion for Summary Judgment on Whistleblower Protection Act Claim and Attached Exhibits filed in *Murillo v. Lea County*, No. D-506-CV-2024-00477 (Dkt. No. 99-1 at 1–116)
- **Plaintiff's Exhibit 2**, Declaration of Curtis Waldo (Dkt. No. 90-1 at 1–2)
- **Plaintiff's Exhibit 3**, Declaration of Benjamin Gubernick (Dkt. No. 90-2 at 1–2)
- **Plaintiff's Exhibit 4**, Declaration of Jason Sanchez (Dkt. No. 90-3 at 1–2).[5]

Having thoroughly considered the briefs, the evidence, the parties' arguments, and the relevant law, the Court will **DENY** the Motion in all respects.

## I.    PROCEDURAL BACKGROUND

On August 7, 2025, Defendants filed the instant Motion seeking three principal forms of

---

to their reply as "Defendants' Exhibit 2" and "Defendants' Exhibit 3." The Court then directed Plaintiff to mark previously-unmarked declarations attached to their response as "Plaintiff's Exhibit 2," "Plaintiff's Exhibit 3," and "Plaintiff's Exhibit 4." The Court refers to the exhibits herein in the manner in which the parties were directed to mark and re-mark them at the evidentiary hearing.

[4] In their Notice of Intent to Use Exhibits at Evidentiary Hearing, Lea County Defendants identified a web address as Exhibit A: https://www.facebook.com/search/top?q=eddy%20and%20lea%20county%20exposed Dkt. No. 97 at 1. The Court instructed Defendants to "somehow" mark and send to chambers what the Court and counsel agreed was a a "snapshot" of the condition of the Eddy and Lea County Exposed Facebook page as of September 8, 2025. Defendants did not submit any document for the Court's consideration, electronic or otherwise, apart from the web address identified in the referenced notice. When the Court attempted to use the provided link, it was directed to a message indicating that the link was "broken" or "the page may have been removed." Because Defendants' Exhibit 4 was not provided in a format accessible by the Court, it was not reviewed or considered for purposes of resolving the Motion.

[5] In their briefing and again at the evidentiary hearing, Defendants asked the Court to strike the Declaration of Jason Sanchez in the absence of his live testimony at the hearing. As grounds, Defendants referred the Court to Federal Rule of Civil Procedure 12. Rule 12(f) permits a court to "strike *from a pleading* an insufficient defense or any redundant, immaterial, impertinent or scandalous matter[,]" Fed. R. Civ. P. 12(f) (emphasis added), but it does not authorize a Court to strike a declaration in the absence of live testimony. Because Defendants failed to provide any applicable authority for striking Sanchez's declaration or to subpoena him for purposes of providing testimony at the evidentiary hearing, the Court denied Defendants' request and has considered his declaration for purposes of resolving the Motion.

relief: (1) a temporary stay of discovery pending resolution of the Motion; (2) the sealing of all court records in this case; and (3) a protective order prohibiting disclosure of deposition transcripts and videos, discovery responses and disclosures, and any pleadings that rely upon or cite such items within the pleading or as an exhibit.

Concurrently with the Motion, Defendants Sonia Estrada and Sean Roach each filed Notices of Non-Appearance for their depositions, which were scheduled for August 11 and 12, 2025, respectively. *See* Dkt. No. 81; Dkt. No. 80. As grounds for their non-appearance, both Defendants referred to the pendency of the instant Motion. *See* Dkt. No. 81; Dkt. No. 80. The Notices of Non-Appearance prompted e-mail correspondence from Plaintiff's counsel to the Court and a request for an informal discovery conference. The Court held an informal telephonic conference the next day, taking up the issue of the Notices of Non-Appearance and the related requests from Defendants that the depositions of Defendants Estrada and Roach, together with any other outstanding discovery, be delayed until after resolution of the Motion. *See* Dkt. No. 84.

As a compromise and so that the depositions of Defendants Estrada and Roach could go forward, Plaintiff offered a stipulation that, in the Court's assessment, was coterminous with the relief Defendants would obtain as to the depositions if the instant Motion were granted in full: that any information of any kind generated during those depositions would remain confidential and would not be disclosed to any person other than Plaintiff's counsel and Plaintiff.[6] *Id.* at 3. All counsel having agreed to the stipulation articulated at the status conference, the Court entered an

---

[6] As memorialized in the Court's August 11, 2025 Interim Confidentiality Order, the stipulation further specified that the material to remain confidential included: (1) the deposition transcripts of Defendants Estrada and Roach or any portion of them, (2) the video depositions of Defendants Estrada and Roach and any portion of them, (3) any description of what was heard in the depositions of Defendants Estrada and Roach, and (4) any documents memorializing actions taken by the Court to resolve discovery disputes as to the subject depositions. Dkt. No. 85 at 2.

Interim Confidentiality Order that memorialized the stipulation (Dkt. No. 85) and sealed its own Clerk's Minutes from the conference on an interim basis (Dkt. No. 84). Discovery resumed, and the depositions of Defendants Estrada and Roach went forward as scheduled without any further Court intervention.

After the instant Motion was fully briefed, the Court held a hearing on September 8, 2025, for the purpose of receiving additional evidence and hearing oral argument. Dkt. No. 102. At the conclusion of that hearing, the Court took the Motion under advisement and encouraged the parties to collaborate on a confidentiality order. *Id*. at 5. A few weeks later, the parties submitted a proposed stipulated confidentiality order, which the Court entered. *See* Dkt. No. 110.

## II. PARTIES' PRIMARY ARGUMENTS

### A. Defendants' Arguments

Defendants urge the Court to seal all filings in this case to spare the parties and witnesses from harassment and intimidation and to prevent the jury pool from being improperly influenced. Defendants' principal complaint is that Plaintiff is using a Facebook page operated by non-party Jason Sanchez to harass and dissuade participation in discovery. Relatedly, Defendants contend that many of Plaintiff's filings in this case have been prepared and submitted not for legitimate purposes but to provide fodder for Mr. Sanchez's Facebook page and in a coordinated attempt to intimidate witnesses and taint the jury pool. Defendants also complain that Plaintiff's counsel provided to the Hobbs News-Sun the video deposition of Defendant Michael Walker, which was used in a story published by that newspaper and which Defendants allege caused prospective witnesses to be unwilling to participate in depositions. Defendants suggest that Plaintiff's actions, and those of her counsel and non-party Sanchez, are aimed at "gratify[ing] private spite,"

"promot[ing] public scandal," and "depriv[ing] the public and the Parties from the benefit of a fair and impartial judicial process." Dkt. No. 98 at 1 (quoting *Nixon v. Warner Comms., Inc.*, 435 U.S. 589, 602 (1978)). For these reasons, Defendants contend that they have demonstrated the need for the Court to take the extraordinary step of sealing the filings in this case.

### B. Plaintiff's Arguments

Plaintiff, on the other hand, insists that Defendants have failed to overcome the "presumption of openness" by articulating a significant countervailing interest. Plaintiff emphasizes that Defendants are public officials and accountable to the public. In addition, she suggests that Defendants' denial of any involvement in the underlying incident (*i.e.*, the dissemination of an intimate video of Plaintiff) is what necessitated many of the filings on the docket and much of the discovery in this case. Plaintiff argues that Defendants' purported privacy interests are undermined both by their public denials of any wrongdoing and by the amount of material that is already in the public sphere concerning the underlying incident. Accordingly, she urges the Court to deny Defendants' request to seal the filings in this case.

## III. LEGAL STANDARDS

"Courts have long recognized a common-law right of access to judicial records." *United States v. Bacon*, 950 F.3d 1286, 1292 (10th Cir. 2020) (citations omitted). When analyzing a motion to seal, a court begins with a "strong presumption in favor of public access." *Id.* at 1293. The party asking the court to seal its filings "bears the burden of showing some significant interest that outweighs the presumption." *United States v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013) (citation omitted). Although courts enjoy discretion in whether to seal, *Nixon*, 435 U.S. at 599, the movant's burden is a heavy one, *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d

1124, 1136 (10th Cir. 2011).

The Tenth Circuit has described its inquiry as "necessarily fact-bound" and its decision as one made "in light of the relevant facts and circumstances of the particular case." *United States v. Hickey*, 767 F.2d 705, 708 (10th Cir. 1985). As Judge Yarbrough of this District has observed, "[a]n unpublished Tenth Circuit case blesses a three-step process to guide courts' discretion: first examining the public's interest in the information, then examining the moving party's interest in sealing, and finally weighing the two." *Jacobs v. J. Publ'g Co*., No. 1:21-cv-00690-MV-SCY, 2022 WL 540955 (D.N.M. Feb. 23, 2022) (citing *Riker v. Fed. Bureau of Prisons*, 315 F. App'x 752, 755 (10th Cir. 2009)). The "strong presumption of openness can 'be overcome where countervailing interests heavily outweigh the public interests in access' to the judicial record." *Bacon*, 950 F.3d at 1293 (citations omitted).

## IV.  ANALYSIS

Developments since the filing of Defendants' Motion have effectively resolved or mooted portions of the motion. First, insofar as the motion requested a temporary stay of discovery pending its resolution, the Court effectively denied such relief when it ordered the depositions of Defendants Estrada and Roach to go forward subject to the Interim Confidentiality Order (*see* Dkt. No. 84 at 4) and when it permitted the parties to brief the Motion without staying discovery.

To the extent Defendants sought an order prohibiting disclosure of deposition transcripts and any filings that relied upon or cited those transcripts, the Court granted such relief as to the depositions of Defendants Estrada and Roach, albeit on an interim basis, when it entered the Interim Confidentiality Order. *See* Dkt. No. 85. But more importantly, the provisions within the parties' Stipulated Confidentiality Order have implications for the relief that Defendants request

6

in their Motion.

As Defendants recently acknowledged in their Motion to Vacate Scheduling Order, the Stipulated Confidentiality Order that the Court entered following the evidentiary hearing "address[es] components" of the Motion. Dkt. No. 108 at 5. That is, pursuant to the parties' Stipulated Confidentiality Order, when one party marks a document produced in discovery as "confidential," it triggers a duty by the receiving party to "take appropriate action to insure [sic] the document receives proper protection from public disclosure." Dkt. No. 110 at 2–3. With respect to deposition transcripts, recordings, and answers to interrogatories, the Order specifies that such documents are "not public records prior to their use in support of pleadings or at trial" and therefore "will not be produced to anyone other than the parties or representatives of the parties" and "will not be disseminated to the members of the press or any other interested individuals." *Id*. at 5.

The Court is satisfied that the terms of the Stipulated Confidentiality Order, to which all parties agreed, essentially effect the relief Defendants sought in their Motion as to prohibitions on disclosure of discovery materials. As such, the Court will **DENY** Defendants' Motion insofar as it seeks "a protective order prohibiting disclosure of deposition transcripts and videos, discovery responses and disclosures, and any pleadings that rely upon or citing such items within the pleading or as an exhibit." *See* Dkt. 79 at 1. Thus, the only outstanding issue in the Motion is whether the Court should seal *all* filings in this case.

### A.  Presumption of Openness

As to the issue of whether to order the blanket sealing of this case, the Court begins, as it must, with the presumption that the public should have access to judicial filings. *See Bacon*, 950 F.3d at 1293. That is, in recognition of this country's more-than-two-hundred-year-old tradition of

litigating civil cases in public and not in secret, the Court defaults to a "presumption of openness." *Id*. Notably, while courts do sometimes remove from public access select filings or portions of filings for various reasons, it is the <u>very</u> rare civil case in which a court grants a blanket sealing of *all* filings. *See United States v. Pickard*, 733 F.3d 1297, 1304 (10th Cir. 2013) (observing that when weighing an interest in sealing against the presumption of public access, courts first consider whether *selective redaction* may be effective before sealing even documents in their entirety) (citations omitted). At the evidentiary hearing, defense counsel recognized the ambitious and extraordinary nature of the relief requested in their Motion, advising that they have never before requested such relief. Given the strong and long-standing "presumption of openness," it is perhaps not surprising that this also marks the first request for blanket sealing that the undersigned has entertained in any civil case.

**B.    Defendants' Interest in Sealing**

Bearing in mind the "presumption of openness," the Court turns to Defendants' interest in removing the filings in this case from the public marketplace. Defendants offer two primary bases for this extraordinary relief: (1) to spare parties and witnesses from harassment and intimidation and (2) to curtail improper influence on the jury pool. They offer various categories of evidence to support both bases, which the Court addresses below.

**i.    "Eddy and Lea County Exposed" Facebook Page**

Defendants' principal complaint is that Plaintiff and her associates are using social media "to post pleadings from this case to intimidate, annoy, and threaten the parties . . . and potential witnesses" and to "improperly influence the jury pool." Dkt. No. 79 at 2–3. Specifically, they contend that Jason Sanchez, an individual who has been represented by the same law firm that

represents Plaintiff here, operates the "Eddy and Lea County Exposed" Facebook page (hereafter "Facebook page") on which he "routinely [posts] pleadings, motions, and other court filings in this case." *Id.* at 3. Defendants represent that Sanchez's Facebook posts have caused parties and potential witnesses in this case to become "unwilling to testify in depositions for fear that their testimony will be posted online, out of context, [and] with harassing commentary from Mr. Sanchez and his followers." *Id.* at 4. Defendants insist that Plaintiff and her counsel have "collaborat[ed]" with Sanchez and enjoy "at least some level of control" over him and his Facebook page, as evidenced by (1) Sanchez's "uncanny knack for knowing when documents have been filed" in this case; (2) Sanchez's responsiveness when Plaintiff's counsel have instructed him to take corrective action concerning posts on his Facebook page; and (3) instances of Sanchez "quickly com[ing] to Plaintiff's aid" when "someone questions or refutes statements by Plaintiff" on his Facebook page. Dkt. No. 79 at 4; Dkt. No. 98 at 2–7.

For her part, Plaintiff distances herself from Sanchez and his Facebook page, insisting that neither she nor her counsel exercise any authority or control over the material he posts and that Sanchez and his social media activity are irrelevant to the matters before the Court. She describes Sanchez as a private citizen who has taken an interest in this case because it involves allegations of local corruption. She submits as evidence Sanchez's declaration in which he explains that he has used PACER, pacermonitor.com, and courtlistener.com to monitor court filings in Southeast New Mexico cases related to public corruption. Pl.'s Ex. 3 ¶ 7. According to Sanchez's declaration, he has bookmarked 20-25 cases, including this one, for which he receives notifications each time a new filing is made. *Id.* ¶¶ 8–9. Sanchez describes the operation of his Facebook page in this way: "I operate my Facebook page. I decide what to post and what to redact, delete, or edit. I am not an

agent of anyone, including my attorneys." *Id*. ¶ 13.

Plaintiff also submits a declaration from each of her lawyers.[7] In Mr. Gubernick's, he denies ever "instructing, requesting, or otherwise suggest[ing]" that Sanchez include any post on his Facebook page. Pl.'s Ex. 3 ¶ 8. As for Mr. Waldo, he maintains that he "do[es] not have the ability to post on Mr. Sanchez's page," that he has "[n]ever made such posts or comments," and that "all the posts on this page are made by Mr. Sanchez." Pl.'s Ex. 2 ¶ 7. Sanchez's declaration is in accord: "[N]o one from [Plaintiff's counsel's firm] has ever told me to make any Facebook post." Pl.'s Ex. 3 ¶ 11. In addition, defense witness Investigator Jim Hardy conceded at the evidentiary hearing that he did not have evidence that Plaintiff or her counsel have provided confidential information to Sanchez about this case or directed him to post content on his Facebook page. Based on the evidence before it, the Court finds that Sanchez's sources of Court filings and case information for inclusion on his Facebook page are *not* Plaintiff or her counsel but instead primarily databases available to the public—including PACER and the like—or the courts themselves.[8]

Not only do Defendants accuse Plaintiff and her counsel of exercising authority over Sanchez's Facebook page, they also contend that Plaintiff's counsel have prepared and submitted

---

[7] After Plaintiff provided the declarations of her attorneys in support of her response to the Motion, Lea County Defendants provided notice of their intent to call both attorneys to testify at the evidentiary hearing. The Court expressed its reluctance to allow Defendants to call opposing counsel to testify without a compelling reason, and Defendants responded by withdrawing their request and agreeing to accept counsel's representations, though not made under oath, that they did not authorize (or give a "green light" to) Sanchez to post on his Facebook page an e-mail from Jim Hardy to defense counsel. *See* Hr'g at 11:53:40–11:56:52.

[8] As discussed below, Investigator Hardy testified about one instance in which Sanchez obtained and posted on his Facebook page an e-mail that Hardy sent only to defense counsel concerning matters in this case. In that isolated instance, it appears that Sanchez's source was neither a public database nor a court. Even so, there is no evidence to suggest that Plaintiff of her counsel had access to Hardy's e-mail or provided it to Sanchez.

filings in this case "not for legitimate litigation purposes, but to provide fodder for Mr. Sanchez's Facebook page, [and to] attempt to intimidate witnesses and taint the jury pool." Dkt. No. 79 at 4. Specifically, Defendants point to Mr. Waldo's July 28, 2025 letter to the Court, which Mr. Waldo both e-mailed *and* filed on the docket.[9] *See* Dkt. No. 73. After its filing, Defendants advised Mr. Waldo and the Court that the letter contained the full name of Defendant Diana Jurado's minor child in violation of Federal Rule of Civil Procedure 5.2(a)(3). Because e-mail had been the parties' primary method of communicating with the Court about discovery disputes but on this occasion Mr. Waldo opted to *file* his letter on the docket, Defendants posit that he must have filed the letter with the intent of making it available for Sanchez to post on his Facebook page. Dkt. No. 79 at 7. To be sure, within a few hours of its filing, Sanchez had in fact posted counsel's letter, which also bore the minor's name.

According to Sanchez's declaration, though, he discovered the letter independently and not as the result of any communication with Plaintiff's counsel. Pl.'s Ex. 3 ¶ 11. In his own declaration, Mr. Waldo insists that he "did not inform Mr. Sanchez that [he] filed the letter . . . and certainly did not tell Mr. Sanchez to post anything on Facebook about th[e] letter." Pl.'s Ex. 2 ¶ 9. In any event, after defense counsel alerted Mr. Waldo of his Rule 5.2(a)(3) violation, Mr. Waldo promptly corrected the error, filing a redacted version of the same letter on the docket. *Compare* Dkt. No. 73 (marked "Filed in Error"), *with* Dkt. No. 75. Mr. Waldo also agreed to contact Sanchez to request that he too redact the minor's name from the version of the letter posted on Facebook.

---

[9] At oral argument, defense counsel alluded to another instance of Plaintiff's counsel filing a similar letter on the Court's docket that also rehashed text messages sent during the underlying incident and accused Defendants of withholding documents that should be produced. *See* Hr'g at 12:17:30–12:18:39. It is unclear to the Court to which additional letter counsel may have been referring, as Defendants have not pointed the Court to such a document with any specificity.

Sanchez initially complied with Mr. Waldo's request, but in the days that followed, Sanchez apparently reconsidered, re-posting images of the earlier version of Mr. Waldo's letter that *include* the minor's name without redaction.

To the extent Defendants suggest that Sanchez's initial responsiveness to Mr. Waldo's request for redaction supports an inference that Mr. Waldo or Plaintiff have control over Sanchez's Facebook page, the Court is not persuaded. At most, Defendants have presented evidence of *short-lived* compliance with Mr. Waldo's request that Sanchez redact the posted letter that Mr. Waldo authored. Moreover, although counsel's inclusion of a minor's name in a public filing—and the compounding of that transgression when Sanchez posted and reposted the same document on social medial—are certainly unfortunate, the Court does not find the sequence of events to be necessarily indicative of coordination between Plaintiff's counsel and Sanchez with the intention of intimidating or harassing any witness or influencing the jury pool. Setting aside the issue of whether Mr. Waldo's July 28, 2025 letter was "theatrical in nature," as Defendants contend, the Court does not agree that it lacked any legitimate litigation purpose. As the Court noted at its status conference that same day, the letter contrasted the information derived from the New Mexico State Police's 2023 cell phone extraction with the information Defendants produced from their own 2025 cell phone extractions, highlighting concerns that the 2025 extractions had not produced more responsive communications and prompting the Court's in camera review of the 2025 extractions. *See* Dkt. No. 74. As to Defendants' concerns that the letter was unnecessarily filed on the docket (in addition to being forwarded via e-mail), the Court addressed those concerns in part by directing all counsel to refrain from filing on the docket any correspondence that counsel also provide to the Court via e-mail unless specifically instructed to do so. Dkt. No. 84 at 4.

Plaintiff's counsel having now assured the Court that going forward they will engage in additional review of public filings to ensure that no minor's names are included, and the Court having admonished counsel that it will be less solicitous of any repeat offense of this nature, the Court is satisfied that these admonishments and assurances adequately address the filing missteps related to the July 28, 2025 letter. And insofar as the instant Motion is concerned, the admonishments and assurances should also help allay Defendants' concerns about the generation of improper filings for purposes of dissemination on social media.

Defendants next suggest that instances of Sanchez defending Plaintiff when "someone questions or refutes [her] statements" on Facebook amount to evidence of Plaintiff's influence or control over the content of Sanchez's Facebook page. Dkt. No. 98 at 2. In support, they point to Defendants' Exhibit 2, which appears to be an online exchange ostensibly between Plaintiff and Amy Jones with an interjection by Sanchez. *Id.* (citing Defs.' Ex. 2). In the provided messages, Amy Jones alleges that Sanchez's Facebook page is "fueled by Karia [sic] Tello" and suggests that she was "blocked" from the Facebook page because she "finally spoke the truth." Defs.' Ex. 2 at 10. Without any additional context, the Court finds Defendants' suggestion that these messages demonstrate collaboration between Plaintiff and Sanchez to be speculative at best.

In sum, the Court finds and concludes that Defendants' allegations and intimations that Plaintiff and her counsel collaborated with Sanchez concerning the content of his Facebook page are unsupported by competent evidence. Indeed, Defendants failed to present any non-speculative evidence to show that Plaintiff and her counsel supplied Court filings to Sanchez or enjoyed any appreciable control over the content of his Facebook page. Without evidentiary support for their allegation that Plaintiff and her counsel are using Sanchez's Facebook page to intimidate or harass

13

parties or potential witnesses in this case, the content of that page—however scandalous or critical of Defendants or potential witnesses—does not implicate a strong interest in a blanket sealing of this case.

### ii.  Witness Intimidation or Harassment

Also bearing on Defendants' allegations of witness and party intimidation and harassment is the testimony of Jim Hardy, Defendants' hired investigator. In his affidavit that Defendants submit in conjunction with their Motion, Investigator Hardy reports that "[w]itnesses have expressed fear of retaliation against them by Plaintiff and individuals associated with her" and, as a result, "have declined to execute affidavits and do not wish to participate in litigation." Defs.' Ex. 1 ¶¶ 11–12. At the evidentiary hearing, Hardy identified the witnesses to whom he was referring in his affidavit, naming five individuals who may have information relevant to Plaintiff or to this case. Of the individuals he named, he testified that he had prepared an affidavit for Jaycie Homer, who had rejected the affidavit for fear of retaliation through social medial or otherwise. When the Court sought clarification, Mr. Hardy conceded that *none* of the five reluctant potential witnesses, including Ms. Homer, had been *subpoenaed* for a deposition.

Hardy also testified about an e-mail that he sent only to defense counsel but which Sanchez obtained and posted on his Facebook page**.** As Mr. Hardy described it, the leaked e-mail discussed defense strategy and identified Jaycie Homer as a potential witness in this case. Hardy characterized Sanchez's posting of the confidential e-mail, together with his declaration that he had a "man on the inside," as a form of "witness intimidation," noting that he himself had been identified by Plaintiff as a potential witness. But Mr. Hardy also testified that he did not know how Sanchez obtained the e-mail and, further, that his investigation into the matter revealed no evidence

that Plaintiff or her counsel, *who were not recipients of the e-mail*, were its source.

Defendants have also suggested that memes created on the "Pinata Farms apps" and posted on Sanchez's Facebook page are implicitly threatening such that they may curtail witness and party participation in this case. Defendants again elicited testimony from Investigator Hardy on this topic. He described some of these animated memes, including one depicting Plaintiff walking alongside Defendant Diana Jurado and smiling as Jurado is struck by a school bus and another depicting Plaintiff shooting an individual who appears to be Defendant Corey Helton with a harpoon gun. Dkt. No. 79 at 8; Defs. Ex. 1 ¶ 13. Despite characterizing the memes as threatening, Defendants did not present credible evidence to establish that any party or potential witness has experienced serious concerns for their personal safety due to the actions of Sanchez, Plaintiff, or her counsel. For instance, when Defendant Diana Jurado was asked whether she was concerned about her own safety or that of her minor child, she articulated concerns related to her and her family's standing and reputation in the community, not their physical safety. Responding to the Court's questions, she testified that neither she nor her son had made a report to a law enforcement agency or taken any actions to protect their own physical safety based on Sanchez's actions or statements. Investigator Hardy, who testified that he too was a target of Sanchez's memes, described concerns about his personal and professional reputation, but not serious concerns for his personal safety.[10]  Likewise, counsel for Defendants concede that they do not have serious concerns about the personal safety of the parties and witnesses in this case but are instead concerned that

---

[10] Although Investigator Hardy testified that he had taken steps, including meeting with an attorney, to monitor Sanchez's movements, he explained that he "would not let [Sanchez] intimidate [him]" and that the "only person [he was] concerned about" was his visually-impaired wife. *See* Hr'g at 11:17:04–11:18:30. Given his continued voluntary participation in the case as a hired investigator and his emphasis on potential impacts to his reputation, the Court does not find Hardy's testimony to describe personal safety concerns of a serious nature.

those individuals may suffer adverse effects on their reputations and livelihoods due to defamatory statements by Plaintiff or those associated with her.

Based on the evidence before it, the Court finds and concludes that there is no evidence of witness intimidation or harassment that rises to the level of serious threats to personal safety or that has impeded Defendants' ability to obtain witness testimony, including through subpoena. Rather, the evidence before the Court suggests that parties and potential witnesses may be experiencing frustration and professional complications from unflattering, or perhaps even defamatory, statements made in primarily public forums. Although false statements made by non-parties in retaliation for witness or party participation in this case may be actionable in a separate lawsuit, the sealing of this case's docket is not among the available remedies. In short, Defendants have not demonstrated that the witness harassment and intimidation they allege implicates a strong interest in sealing this case.

### iii. Hobbs News-Sun Coverage and Jury Pool Influence

Finally, Defendants complain that Plaintiff and her counsel provided to the Hobbs News-Sun the video deposition of Defendant Michael Walker, which was used in a story published by that newspaper on July 29, 2025. Defendants contend that the article, in turn, caused prospective witnesses to be unwilling to participate in depositions and resulted in improper influence over the jury pool. But Defendants have not provided evidence of witness non-compliance with subpoenas on account of the Hobbs News-Sun publication. And as for Defendants' complaints about counsel having supplied the deposition to a media outlet, Defendants cite no on-point authority establishing that providing a lawfully-possessed, unsealed deposition to a reporter was a violation of law or

ethics under the circumstances here.[11] With respect to Defendants' concerns about influence over the jury pool, Defendants have not offered evidence establishing the readership of the Hobbs News-Sun or otherwise shown that there has been influence that cannot be adequately addressed through voir dire. Indeed, the Court is confident that counsel and the presiding judge can work together to formulate voir dire questions to identify potential jurors who were exposed to newspaper accounts of the facts and allegations in this case, just as they can formulate questions to identify those exposed to Sanchez's Facebook page. Neither witness reluctance nor jury pool influence implicate a strong interest in a blanket sealing of this case.

### C.    Weighing the Competing Interests

Having considered and weighed Defendants' interest in sealing the filings in this case against the public's interest in accessing those filings, the Court concludes that Defendants have failed to articulate a sufficiently significant interest in sealing to override the strong presumption of public access. Notably, the public's already strong interest in accessing judicial records in general is all the more compelling here because of the involvement of public officials who are accountable to the citizens they serve and who are alleged to have abused their government power to Plaintiff's detriment. Moreover, Defendants' own briefing and evidentiary offerings suggest that there has been considerable interest in and regional media coverage of this case and the related criminal case, by professional journalists and interested social media users alike. That Defendants would prefer there be less interest or less publicity is no reason for the Court to remove this case

---

[11] As the Court noted at the hearing, whether unilaterally providing a video deposition to a reporter is likely to breed distrust amongst legal professionals is an entirely separate question. In any event, the parties' Stipulated Confidentiality Order suggests that the practice will not be repeated in this case going forward. Dkt. No. 110 ¶ 9 (providing that deposition transcripts and recordings "are not public records prior to their use in support of pleadings or at trial[,] will not be produced to anyone other than parties or representatives of parties[, and] will not be disseminated to members of the press or any other interested individuals").

and its filings from public discourse. Indeed, the already-public nature of many filings and allegations in this case, including on Sanchez's Facebook page and in the Hobbs News-Sun, *diminishes* rather than elevates Defendants' interest in restricting access to filings in this case. And as the Court expressed at the evidentiary hearing, it is reluctant to violate this country's tradition—for hundreds of years—of permitting access to the courts and their records in the absence of the most extraordinary circumstances. Circumstances justifying such an action simply do not exist here.

## V.  CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Joint Motion for Protective Order and Request to Seal Court Records (Dkt. No. 79) is DENIED.

IT IS FURTHER ORDERED that the Interim Confidentiality Order (Dkt. No. 85) is VACATED.

IT IS FINALLY ORDERED that the temporary sealing of documents memorializing actions taken by the Court to resolve discovery disputes as to the depositions of Defendants Estrada and Roach, including with respect to its August 8, 2025 Clerk's Minutes (Dkt. No. 84), is LIFTED, and the Clerk's Office is DIRECTED to remove filing-restrictions therefrom.

SO ORDERED.

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE